Argued and submitted October 9, 1984, complaint dismissed January 29, 1985

# In re Complaint as to the Conduct of
## RUSSELL D. BEVANS,
*Accused.*

## (OSB 82-86; SC S30851)
695 P2d 41

Russell D. Bevans, Eugene, argued the cause and filed a brief in propria persona.

William A. Furtick, Eugene, argued the cause and filed the brief for the Oregon State Bar.

Before Lent, Presiding Justice, and Linde, Campbell, Roberts, Carson and Jones, Justices.*

---

* Parties stipulated to the participation of Peterson, C. J., in the decision.

PER CURIAM

## PER CURIAM

This is a disciplinary case in which the accused, Russell D. Bevans, is charged by the Oregon State Bar with violations of DR 5-101(A), DR 5-105(A) and DR 5-105(B) of the Code of Professional Responsibility.[1] The Bar's complaint contained three causes arising from the accused's participation in a series of three loan transactions between Douglas Bowen (Bowen) of All-Risk Management, Inc. (All-Risk), the lender, and John M. Wendel (Wendel), the borrower, both of whom the accused had represented previously. Also involved in the loan transactions were George and Marjorielee Renfro (the Renfros), Wendel's grandparents-in-law, who provided the security for the loans.

The violations alleged in the Bar's complaint are in relevant part as follows:

"For the FIRST CAUSE OF COMPLAINT * * *

"* * * * *

"VI.

"On or about March 30, 1981, the Accused prepared, and the parties signed, a promissory note and trust deed securing a loan of $20,000 made by All-Risk to Wendel. The obligors/grantors in this transaction were George and Marjorielee Renfro ('Renfros'), Wendel's in-laws, whose real property was being used to secure the loan.

---

[1] DR 5-101(A) provides:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

DR 5-105 provides in pertinent part:

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

"VII.

"The Accused failed to clarify who he represented in the transaction described in paragraph VI above, attempting to act as scrivener in preparing the loan documents. By virtue of his status as a creditor of Wendel and because participants in the transaction were clients of the Accused, the Accused's involvement in the transaction constituted a conflict of interest. Disclosures of the conflict of interest, if any, made by the Accused to his clients were insufficient for the clients to give an informed consent to the conflict. The Accused could not adequately represent the interests of multiple clients in this transaction.

"VIII.

"The aforesaid conduct of the Accused was and is unethical and in violation of the standards of professional conduct established by law and by the Oregon State Bar, to wit:

"(1)   DR 5-101(A);

"(2)   DR 5-105(A).

"AND, for its SECOND CAUSE OF COMPLAINT against the accused, the Oregon State Bar alleges:

"* * * * *

"X.

"On or about May 28, 1981, the Accused prepared, and the parties signed, additional loan documents including a promissory note, trust deed and security agreement securing a further loan of approximately $32,500 made by All-Risk to Wendel. Wendel, the Renfros and one of Wendel's corporations were obligors in this transaction and a mobile home owned by the Renfros was utilized as additional security.

"XI.

"The accused failed to clarify who he represented in the transaction described in paragraph X above, attempting to act as scrivener in preparing the loan documents. By virtue of his status as a creditor of Wendel and because participants in the transaction were clients of the Accused, the Accused's involvement in the transaction constituted a conflict of interest. Disclosures of the conflict of interest, if any, made by the Accused to his clients were insufficient for the clients to give an informed consent to the conflict. The Accused could not adequately represent the interests of multiple clients in this transaction.

"XII.

"The aforesaid conduct of the Accused was and is unethical and in violation of the standards of professional conduct established by law and by the Oregon State Bar, to wit:

"(1)   DR 5-101(A);

"(2)   DR 5-105(A) and (B).

"AND, for its THIRD CAUSE OF COMPLAINT against the Accused, the Oregon State Bar alleges:

"* * * * *

"On or about July 10, 1981, the Accused prepared, and the parties signed, a loan agreement between All-Risk as creditor and Wendel, the Renfros and one of Wendel's corporations as debtors, wherein the total amount owed by the debtors to All-Risk was increased to $95,387.80, and all obligations, covenants and security of the previous loan transactions were affirmed and incorporated into the agreement for this higher loan balance.

"XV.

"The loan agreement signed on July 10, 1981 contained a disclaimer that the Accused's firm was only representing All-Risk in the transaction and a disclosure of a possible conflict of interest because of the Accused's status as a creditor of Wendel and as attorney for some of the parties in other matters. However, the disclaimer and disclosure were insufficient for the parties to know of the limitation of the Accused's representation in the transaction or for the parties to give an informed consent to these conflicts or to the conflict between the parties' respective interests. The Accused could not adequately represent the interests of multiple clients in this transaction.

"XVI.

"The aforesaid conduct of the Accused was and is unethical and in violation of the standards of professional conduct established by law and by the Oregon State Bar, to wit:

"(1)   DR 5-101(A);

"(2)   DR 5-105(A) and (B)."

From our review of the record we find that in early 1981, the accused was engaged by Wendel to form two Oregon

corporations, International Diamond Exchange Corp. (International Diamond) and National Forestry Services, Inc. The accused did the legal work to form both corporations and, in doing so, was appointed registered agent for service of process for International Diamond. In March 1981, after the legal work was done to form these corporations, Wendel approached the accused seeking a loan of $5,000. The funds purportedly were to be used by Wendel to enter a very profitable diamond transaction. The accused agreed to loan Wendel the $5,000 for six weeks. The accused informed Wendel that, because of the personal loan, he would be unable to represent Wendel until the loan was repaid.[2] On March 19, 1981, the accused loaned Wendel $5,000 evidenced by a promissory note which remained unpaid at the time of the disciplinary hearings in this case. A few days later, Wendel again approached the accused, this time seeking $20,000 for a similar "diamond deal." After conferring with other members of the law firm of which he was then a member, the accused decided not to loan Wendel the additional funds, but referred him to a number of persons whom he knew to have made such loans in the past.

One of the persons suggested to Wendel as a possible loan source was Bowen, a client of the accused for some time before the accused met Wendel.[3] Wendel applied to Bowen's corporation, All-Risk, for the $20,000 loan. While All-Risk initially tried to broker the loan to other lenders, that process proved too slow for Wendel. After negotiations, Wendel and Bowen agreed that All-Risk would loan the money to Wendel. At this point Bowen and Wendel agreed that the accused should draw up the loan paperwork. There was some discussion between Bowen and Wendel concerning whether the accused should act as a mere scrivener, without representing either party, but finally it was made clear by the accused that

---

[2] The accused testified that this condition was imposed because of the conflict of interest raised by the creditor/debtor relationship between the accused and Wendel and, in addition, because the accused's wife would agree to the loan only if the accused withdrew from representation of Wendel, toward whom she was antipathetic. The Trial Board and the Disciplinary Review Board found this conversation never took place.

[3] Paul Spotten, a business acquaintance of Wendel, also referred him to Bowen/All-Risk. Mr. Spotten was also a client of the accused and also lost money to Wendel. The accused was still representing both Bowen and Spotten in unrelated matters at the time of the hearings before the Bar.

the accused was to represent only Bowen's (All-Risk's) interests in the loan transaction.[4]

The accused made full disclosure to Bowen of his $5,000 personal loan to Wendel and of his prior representation of Wendel and Wendel's corporations when Bowen first called the accused to request that he prepare the loan documentation for the March 31, 1981, loan from All-Risk to Wendel (hereafter, the first loan). The accused repeated the disclosures to Wendel and Bowen at the accused's office when the three first met with regards to the first loan transaction. Wendel clearly understood that the accused would represent only Bowen/All-Risk. At this point, the accused first suggested that Wendel obtain independent counsel. Wendel chose not to do so.

The accused prepared all the documents for the first loan transaction. Wendel and Bowen agreed that, although the accused would be representing only Bowen, Wendel was to pay the accused's fees generated in the loan transaction as a condition of receiving the loan. On March 31, 1981, the first loan transaction was closed. All-Risk provided the funds requested by Wendel and took back a promissory note secured by a deed of trust on real property owned by the Renfros.[5]

---

[4] Bowen's testimony on this point was challenged by the Bar which questioned Bowen regarding statements made during a deposition taken in April 1983, for a separate civil action:

"Q [Attorney for the Bar] Referring again to your [Bowen's] deposition on page 11, line 21, the question number 7 on that document referring to the one in front of you, or a copy thereof, indicates that the debtors, the Renfros and John Wendel and International Diamond Exchange Corporation acknowledged that Mr. Bevans's law firm is representing you and your company. (Reading)

" 'A That is new to me, I didn't understand it that way. My understanding was that he didn't represent either one of us during that time period.' "

Bowen testified that up until the April 1983, deposition he understood that the accused had acted solely on his behalf in the loan transactions with Wendel. He was "surprised" during the taking of the deposition when counsel representing him in the civil action advised him that the disclosure statement contained in the third loan agreement meant that, until that time, the accused had represented neither Bowen nor Wendel in the prior loan transactions. While the passage of time since the purported disclosures first took place may account for some confusion on the part of Bowen, it does not explain his testimony related to his statements in the deposition. According to his testimony, Bowen "understood" in March of 1981 a circumstance to exist which, when he learned of it in 1983, "surprised" him because it was contrary to his understanding. This confusing and contradictory testimony causes us to view Mr. Bowen's testimony with more than a single grain of salt.

[5] George Renfro died from leukemia a short time after executing the trust deed. His widow was to be left with property encumbered to the extent of nearly $100,000.

Pursuant to the agreement between Wendel and Bowen, the accused was instructed to bill Wendel directly for his charges related to the first loan transaction. Initially the accused billed only Wendel for time spent on the first loan transaction.

According to the Bar, the accused billed Wendel, not pursuant to instructions from Bowen, but because Wendel was his "client," *i.e.,* that he was still engaged by Wendel to act as his attorney in the loan transaction with Bowen/All-Risk. In support of its argument, the Bar offered some of the accused's billing ledger sheets. One set billed International Diamond and another billed Bowen/All-Risk.[6] One ledger, labeled "International Diamond Exchange c/o John M. Wendel," contains the following entries:

| "30 | Picked up financing for *client* from All Risk Mgt. (30 min.) | B | [$]37.50 |
|---|---|---|---|
| "30 | Disbursed funds on loan to *client.* (18 min.) | B | 22.50 |
| "31 | Closing of loan w/Renfros. (24 min.) | B | 30.00 |
| "* * * * * | | | |
| "16 | TC w/John re: insurance garnishment | P | 7.50" |

(Emphasis supplied.)

No month is legible, but the entries probably referred to the months of March and April, 1981.[7]

---

[6] During the interval between August of 1981 and the appearance of the accused in the Bar proceedings in this case, the accused was locked out of his office by the other members of his former law firm. Other members of the accused's ex-firm merged with another firm. At some time during this process someone broke into the office where the records pertinent to the Wendel/Bowen transactions were kept. Billing records important to this and related cases were lost, stolen or misplaced under suspicious circumstances. The evidence is insufficient, however, for us to assess the blame for the absence of the documents.

[7] The Bar asserts that the entry "16 TC w/John re: insurance garnishment P" was made on April 16, 1981, after the accused allegedly withdrew from representing Wendel on March 19, and shows that the attorney/client relationship between the accused and Wendel was not terminated. We have found many ledger entries which were made out of chronological order. As mentioned previously, entries on the ledgers in the record lack any indication as to which month they were to be attributed. Further, the initial "P" found at the end of the entry refers to one of the accused's former associates who apparently handled the telephone call with "John" Wendel. Nevertheless, this is insufficient evidence of a continuing attorney/client relationship between the accused and Wendel. We have no information about any garnishment, who was involved or when or where it occurred.

The first ($20,000) loan was closed on March 30, 1981. There are numerous other references on the ledger sheet to "client." The Bar argued that the use of "client" to refer to Wendel/International Diamond and the fact that the accused billed Wendel for attorney fees from the first loan show that the accused and Wendel continued their attorney/client relationship up through the period following the first loan transaction.

The accused testified that he did not provide Wendel with any legal services after March 19, 1981. He explained that the references to Wendel as "client" found in the International Diamond ledger, allegedly made after March 19, 1981, were merely a means of designating the person who was to be billed and that this was the first time he had been asked to bill one person for the services performed for another.

By the end of May 1981, Wendel wanted more money for his "diamond deal" which, he assured Bowen, the Renfros and the accused, was in the works. Bowen agreed to advance Wendel approximately $38,000 more in exchange for a new note and trust deed on the Renfros' property. By this time, Mr. Renfro was too debilitated to come to the accused's office to sign the required documents, so a notary public from the accused's office accompanied Wendel to the Renfros' home to obtain their signatures. As part of this new loan agreement the accused was to bill Bowen for his time, as Wendel had not paid any of the accused's attorney fees for work done on the first loan. The accused billed only Bowen for the fees related to this second transaction. On May 28, 1981, the "second loan" from Bowen/All-Risk to Wendel was completed, leaving Wendel indebted, and the Renfros' property encumbered for the total of $58,712.20. The accused once again disclosed to Bowen and Wendel his past representation of both, his outstanding personal loan to Wendel, now in default, and that he would represent only Bowen in the loan transaction. The accused also advised Wendel to seek the advice of independent counsel if he had questions.

On July 10, 1981, after the second loan was in default, Bowen/All-Risk and Wendel entered a third loan agreement whereby the old note and trust deed were cancelled and replaced by a new note and trust deed evidencing a $95,387.80 debt. No new money changed hands in this transaction. The

increased principal amount reflected accrued interest and concessions made by Wendel in order to avoid foreclosure of the second loan. At that time Wendel still insisted that the diamond deal was about to go through and everyone soon would have their money. Despite substantial doubts, which prompted the nearly $37,000 additional indebtedness without additional outlay of funds, Bowen agreed to the "third loan." The written agreement prepared by the accused evidencing the third loan contains the first written disclaimer which discloses the accused's prior attorney/client relationship with both Bowen and Wendel on separate matters, the accused's personal loan to Wendel and the statement that the accused would represent only Bowen/All-Risk in the transaction. That disclaimer, dated July 10, reads:

> "Debtors hereby acknowledge that they have been advised that the law firm of Bevans & McCullen, P.C. has prepared this and all related documents at the direction of All Risk Management, Inc. and that said law firm has not attempted in any way to represent Debtors' interests or to advise Debtors in the preparation and execution of this Loan Agreement and related documents. Debtors further acknowledge that they have been advised to seek independent legal counsel in this matter and have been given time to seek such counsel. The parties further acknowledge that they have been informed that a conflict of interest could exist in that the law firm of Bevans & McCullen, P.C. has represented both Creditor and International Diamond Exchange Corporation in separate matters in the past and thereby has knowledge of the dealings of both clients, and, further, since the attorney preparing these documents also has an outstanding and unpaid personal loan to John Wendel. The parties, after indicating an understanding of this conflict of interest, hereby waive any such conflict and desire said law firm to prepare these documents on behalf of Creditor."

The Bar introduced a certified letter from the accused to Wendel written August 21, 1981, which reads:

> "Re: International Diamond Exchange Corp. and National Forestry Services, Inc.
>
> "Dear John:
>
> "Enclosed please find a photocopy of a certified letter I received on August 20, 1981, from All Risk Management, Inc. I was apparently served the certified letter as Registered Agent for International Diamond Exchange Corp.

"It appears that the situation between you and Mr. Bowen has deteriorated to such an extent that this law firm will not be able to handle work for your respective corporations. For this reason, I would request that you pick-up from the office all corporate records belonging to your corporations so that we may complete withdrawal from your representation. I am also preparing resignations to be submitted to the corporate commissioner to remove my name as registered agent for your corporations.

"If you have any questions or comments regarding this matter, please feel free to contact me. Otherwise, please have someone pick-up the corporate records."

The accused further testified that the letter to Wendel of August 21, 1981, was written after it was brought to the accused's attention that he remained the registered agent for service of process for Wendel's two corporations. The letter refers only to the "deteriorated" relationship between Wendel and Bowen, not to any prior agreement between Wendel and the accused, to explain why the accused would no longer represent Wendel or his corporations.

Shortly after this letter was written, Wendel defaulted on his obligation under the third loan agreement and Bowen/All-Risk initiated foreclosure proceedings against the Renfro property. The accused did not participate in this matter which was ultimately settled, but not before Mrs. Renfro filed a grievance against the accused with the Oregon State Bar. In her grievance, Mrs. Renfro alleged that the accused had taken unfair advantage of her and her late husband and had led them to believe he was acting in their behalf in the loan transactions. Upon reflection, Mrs. Renfro decided that her complaint against the accused was unfounded and asked her attorney to have it withdrawn. Acting from that initial impetus, the Bar brought the present action.

Both the Trial Board and the Disciplinary Review Board found the accused had represented both Wendel and Bowen/All-Risk in the first transaction, but found him not guilty of the first cause on the basis that the loan in question was a form note and the parties had testified that oral full disclosure had been made and that informed consent to the multiple representation was obtained.

The Trial Board and the Review Board found the

accused guilty of the violations charged in the second cause. They found that Wendel's default on his loan from the accused and the conflict of interest between Wendel and Bowen/All-Risk made it obvious that the accused could not continue to adequately represent the interests of both Wendel and Bowen/All-Risk in the second loan transaction.

As to the third cause both the Trial Board and Review Board found the accused not guilty.

There are two key fact issues in this disciplinary proceeding. The first is whether the accused continued to represent Wendel after March 19, 1981, specifically, during the first and second loan transactions. The second is whether the accused adequately disclosed to Bowen/ All-Risk and Wendel that he (the accused) had represented both parties in the past, had made a personal loan to Wendel which was still unpaid and that he would represent only Bowen's/ All-Risk's interests in the loan transactions.

In his answer to the Bar's complaint the accused "[a]dmits the accused could not adequately represent the interests of multiple clients in the transaction[s] described in [this case]." The accused denies, however, that he represented Wendel after March 19, 1981.

■ To prove its allegations, the Bar must show by clear and convincing evidence that the accused's conduct was unethical.

DR 5-101(A) provides:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

According to the accused, he did not attempt to represent Wendel after March 19, 1981, the date of his personal loan to Wendel. The accused testified that he informed Wendel, and Wendel agreed, that as a condition of making the loan the attorney/client relationship between Wendel and himself would be terminated (or suspended) until Wendel repaid the loan. There is no evidence that the three subsequent loans from All-Risk to Wendel were contemplated at the time of the accused's personal loan to Wendel. There is

evidence that the accused disclosed the potential conflicts between Wendel and Bowen and himself, as creditor of Wendel, and disclosed that he would represent only Bowen's interests in the three Wendel/Bowen loan transactions.

The evidence in support of the accused's position is:

(1)    The accused's own testimony that his attorney/client relationship with Wendel was severed on March 19, 1981.

(2)    The accused's wife, Linda Bevans, testified that when told by the accused of the contemplated personal loan to Wendel, whom she disliked, she was assured by the accused that he would terminate his representation of Wendel and she extracted from the accused a promise to that effect. She further testified that when Wendel came by to obtain her signature on the $5,000 loan check, she made it clear to Wendel that the only reason she had agreed to the loan was the accused's promise that he would no longer represent Wendel, which Wendel acknowledged.

(3)    Paul Spotten, a business acquaintance of Wendel and another client of the accused, testified he talked to Wendel prior to any of the loan transactions involving Bowen/All-Risk and was told by Wendel that Wendel was not represented by the accused, did not intend to use the accused as his attorney in the loan transactions, and "he [Wendel] didn't feel he needed to be represented."

(4)    Douglas Bowen, the principal of All-Risk, testified it was clearly understood throughout the three Wendel/All-Risk loan transactions that the accused would represent only Bowen/All-Risk. Bowen also testified that prior to acting in each of the three Wendel/All-Risk loans, the accused disclosed his outstanding loan to Wendel, the fact that he had represented both parties in the past and the agreement that he was to represent only Bowen/All-Risk in the transaction and obtained the consent of both Wendel and Bowen to proceed.

The most substantial evidence in support of the Bar's position is:

(1)    The fact that the accused was an unsecured creditor of Wendel at the time he prepared the legal papers

which resulted in Bowen becoming a secured creditor of Wendel.

(2) The letter of August 21, 1981, from the accused to Wendel, purporting to notify Wendel of the accused's withdrawal from representing his two corporations.

(3) The accused's billing ledgers listing Wendel as his client into April of 1981.

(4) The severe impeachment of Bowen created by his inconsistent statements.

■ Taking the evidence as a whole, although a very close question, we cannot say the Bar has clearly and convincingly proved its allegations that the accused represented both Wendel and Bowen/All-Risk in the loan transactions or failed to disclose to Bowen, and obtain his informed consent to proceed, regarding the accused's unpaid personal loan to Wendel.

Since the evidence does not clearly prove that the accused represented both Wendel and Bowen/All-Risk during the loan transactions between those parties, the accused did not violate DR 5-105(A) or (B), which prohibit the acceptance or continuation of representation of multiple clients in situations where the lawyer's "independent professional judgment will be or is likely to be adversely affected" by the multiple employment. *In re Jans*, 295 Or 289, 294, 666 P2d 830 (1983).

It has not been proven by clear and convincing evidence that the accused violated any disciplinary rule and the charges against him are dismissed. No costs awarded to either party.